DECISION AND JOURNAL ENTRY
Megan Smathers appeals her conviction on one count of felony childendangering following a jury trial in the Summit County Court of CommonPleas. This court affirms.
 I. On Tuesday July 13, 1999, Megan Smathers ("Megan") spent the day withher three children, Bethanie Gardner, Chelsea Gardner, and JefferySmathers Jr., in their home at 1930 Gardencourt Drive in Akron.Three-year old Bethanie and five-year old Chelsea were Megan's childrenfrom a previous marriage. Infant Jeffery Jr. was the child of Megan andMegan's husband Jeffery Sr. ("Smathers"). At 4:55 p.m., Megan left thechildren with Smathers and went to work. Shortly after 5 p.m., Smatherscalled EMS, reporting that Bethanie was unresponsive. The paramedicsrushed Bethanie to the hospital, where she died at 5:38 p.m. Bethaniewould have been four years old on July 22.
The medical examiner determined that the death was caused by a blunt force trauma to the abdomen that occurred within one-half hour before death. Given the time of the fatal injury and evidence of prior abuse to Bethanie, Megan was indicted for felony child endangering, in violation of R.C. 2919.22(A). A jury trial was held from November 22-24, 1999, and Megan was found guilty and sentenced to three years of imprisonment.
Megan filed the instant appeal, claiming that the conviction was basedon legally insufficient evidence and the conviction was against themanifest weight of the evidence.
 II. ASSIGNMENT OF ERROR ONE
 THE TRIAL COURT ERRED IN FAILING TO GRANT APPELLANT'S CRIM R. 29 MOTION TO DISMISS THE CHARGE OF "ENDANGERING CHILDREN" AS A FELONY OF THE THIRD DEGREE.
At trial, Megan moved for a judgment of acquittal, both at the close of the state's case and at the close of all the evidence, pursuant to Crim.R. 29. In the first assignment of error Megan argues that the trial court erred in denying these motions because the evidence was legally insufficient, both at the close of the state's case and the close of all evidence, to support a conviction for felony child endangering.
The charge of endangering children is governed by R.C. 2919.22(A)-(E), which provides in relevant part:
 No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. * * *
R.C. 2919.22(A). "If the violation is a violation of division (A) of this section and results in serious physical harm to the child involved, [the offense is] a felony of the third degree." R.C. 2919.22(E)(1)(c). The culpable mental state for this crime is recklessness. See State v.McGee (1997), 79 Ohio St.3d 193, syllabus; R.C. 2901.21(B). "A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." R.C. 2901.22(C).
Megan argues that the state was required to present evidence that, if believed, would have shown that Megan knew not only that Bethanie was being abused but also that the prior abuse was of the type that resulted in serious physical harm. Megan argues that if the evidence did not establish that the prior abuse caused serious physical harm, she could be convicted, at most, of misdemeanor child endangering. We disagree.
If Megan was on notice that Bethanie was the victim of abuse, she was obliged to protect her from that abuse. If, as a result of Megan's failure to protect her, Bethanie was exposed to further abuse that caused her death, Megan could be found guilty of felonious child endangering. See State v. Kamel (1982), 12 Ohio St.3d 306, 308-309, overruled in part on other grounds; State v. Jenks (1991), 61 Ohio St.3d 259, paragraph one of the syllabus.
We now review the legal sufficiency of the evidence. When an appellatecourt reviews for the sufficiency of the evidence, it must look at theevidence presented in the light most favorable to the prosecution and askwhether the evidence, if believed, would permit a rational trier of factto find that the prosecution had proved each element of the offensebeyond a reasonable doubt. See State v. Jackson (1992),82 Ohio App.3d 667, 671; State v. Gasser (1993), 89 Ohio App.3d 544,547, citing State v. Bridgeman (1978), 55 Ohio St.2d 261, syllabus. These elements are that Megan (1) recklessly, that is, indifferent to a known risk (2) "violated a duty of care, protection, or support" for her minor child (3) which created a substantial risk to Bethanie's health and safety and (4) which violation of the duty of care caused serious physical harm to Bethanie. See R.C. 2919.22(A)-(E)(1)(c).
At trial, the state presented as witnesses the paramedics, police officers, medical examiner, Bethanie's father and great-grandmother, a neighbor, and a nurse from the Summit County Children's Services Board. The prosecution offered into evidence photographs of Bethanie, several taken post-mortem, the paramedic's report and the autopsy report. The state also presented a tape recording of police interrogation of Megan that took place after she was advised of her Miranda rights. The interview took place several hours after Bethanie's death.
According to Megan's statement to the police, she had been alone withthe children the entire day prior to leaving for work. Smathers returnedhome with the family car shortly before 5 p.m. on July 13, 1999. Meganadvised her husband that Bethanie was in Megan's bedroom, for a "timeout" because she had been misbehaving. Megan then left the house at 4:55p.m. and drove to work at a pizza shop in Fairlawn. She left the childrenin Smathers' care. Megan clocked in at the restaurant shortly after 5:00p.m. A few minutes later Megan got a call from Smathers, saying that sheshould return home because Bethanie was hurt. The paramedics testifiedthat Smathers was on the phone with Megan when the paramedics arrived atthe house, in response to Smathers' 911 call placed at approximately 5:04p.m. Smathers was the only adult in the house at the time. Theparamedics found Bethanie unconscious and barely breathing. They rushedBethanie to Akron Children's Medical Center, where Bethanie died at 5:38p.m. An autopsy indicated that Bethanie died of a severe blunt force blowto the abdomen, which lacerated her liver, causing her to bleedinternally. The medical examiner stated that the death was due to"multiple abusive episodes." He later opined that Bethanie could havesurvived for only fifteen to thirty minutes after the blow wasinflicted.
Megan explained that she had put Bethanie in a "time out" session just before she left for work because Bethanie had been misbehaving and screaming at Megan. Megan explained that Bethanie was often out of control. Megan denied hitting Bethanie at all that day, claiming that although the child misbehaved, she was disciplined only with a time out. Megan also stated that Chelsea also gets into fights with Bethanie, because Chelsea has Down syndrome and cannot control her behavior. Megan could not recall if Bethanie and Chelsea had gotten into any fights that day.
The police questioned Megan about bruises on Bethanie, including a large bruise on her right cheekbone near the eye, and numerous bruises on her hip, arm, buttocks, and along the spine. Megan stated that she had noticed only the bruise on Bethanie's hip. Megan said that the large bruise along Bethanie's spine, which the medical examiner later identified as "older than several days," possibly occurred when Bethanie hit her back on the wooden portion of a couch, while climbing around a week earlier. Megan said that the injury to the hip probably occurred when, according to Smathers, Bethanie was having a tantrum while she was alone with Smathers, and she pushed herself up against a door. Megan also said that Bethanie occasionally slipped in the tub, while Smathers bathed the children. Megan stated that she works on Wednesdays and Fridays, for no more than four hours on any day. She said that she has never come home and found Bethanie injured.
The paramedics testified to Bethanie's condition upon their arrival, and their efforts to save her life. The police officers testified as to their investigation, in particular their conversations with Megan described above. One detective testified that when he interviewed Megan at 6 p.m. on July 13, she stated the only injury she noticed on Bethanie was an abrasion on her leg. Bethanie's father Mark Gardner ("Mark") and her paternal great-grandmother testified that they last saw Bethanie on June 28, 1999, during their normal Monday visitation. The great-grandmother testified that on that day she observed a large mark along Bethanie's spine and a red burn-like lesion on her chin. She said that Bethanie limped and complained that her foot hurt. Both Mark and the great-grandmother testified that they considered taking Bethanie to the hospital for an examination because of the suspicious injuries, but decided that they would do it when they saw her on the next weekly visit, July 5. However, on Monday July 5, holiday celebrations prevented their visit. On Monday July 12, the day before Bethanie died, Megan told Mark that he could not see the girls because they had a doctor's appointment. A neighbor testified that she never saw the children playing outside, but that one or two days prior to Bethanie's death, she saw the family getting into their car and she noticed that Bethanie had a black eye.
The medical examiner provided the following testimony about his autopsy results. The cause of death was a blunt force trauma to the abdomen, lacerating the liver and causing internal bleeding. Bethanie could not have survived for more than fifteen to thirty minutes following the blow. Bethanie also had a large contusion on the back of her head hidden by her hair and there was a large hemorrhage beneath the surface. This injury occurred between one and eight hours before Bethanie's death. Bethanie had numerous other bruises, some fresh and some aging. The bruise on her cheek near the eye was inflicted by a hit with a cylindrical object one to two days prior to death. Several bruises on Bethanie's arms were at least thirty-six hours old. Some of the injuries to the back were more than several days old, and a large tan area along the spine was a lesion several weeks old. One fresh bruise on the left buttock was caused by a strike with a cylindrical object. Several other bruises on the buttocks were several days old. Bethanie also had a broken left ankle, from approximately six weeks earlier, severe enough to cause Bethanie to limp before the ankle healed. The medical examiner testified that anyone observing Bethanie walk would know that her ankle was injured. Bethanie weighed only twenty-nine pounds and compared to other four-year olds Bethanie was in the bottom five percentile for weight. Her weight had increased by only five pounds in the last twenty-two months. The photographs taken at the time of the autopsy showed numerous bruises on various areas of Bethanie's body, the large laceration under the scalp line, two lacerations on the chin. The bruise on the right cheek near the eye was very large and yellowing.
At the close of the state's case, there was sufficient evidence, if believed, to permit a rational trier of fact to find that the state had proved (1) that Megan knew that Smathers abused Bethanie, (2) that, indifferent to a known risk of abuse, (3) Megan failed to protect Bethanie, and (4) that her failure to protect Bethanie resulted in Bethanie's death.
Megan offered the testimony of Smathers' mother, two of Bethanie'spreschool teachers, Megan's former foster mother, and Megan'shalf-sister. The teachers stated that they had both Bethanie and Chelseain their class for two and one-half hours a day. They acknowledged thatthey last saw Bethanie at the end of school in early June, some six weeksprior to her death. They did not notice any injuries that concernedthem. They also testified that Bethanie did not eat much and she was apicky eater, but she did not refuse food altogether. They also describedBethanie as quiet, well-behaved and very articulate. They stated thatBethanie was in a class with many special needs children like Chelsea,and that she was a very good role model for behavior. They testified thatChelsea, although five years old, was developmentally at the age of atwelve-to eighteen-month old child. They described the sisters as veryaffectionate to one another.
Megan's half sister and Smathers' mother testified that they did not notice any injuries besides bruises that typically result from normal childhood play. Mrs. Smathers testified that Bethanie played very rough with Chelsea. Mrs. Smathers was a nurse, and she stated that she would have reported any suspicions of abuse to CSB. She testified that on Saturday, July 10, she helped Bethanie change her clothes, and did not notice any bruising beyond some "small multiple bruising" on her leg. Mrs. Smathers testified that from June 1 to July 10, she saw the children almost every day and she did not notice any problem with Bethanie's ankle.
This court concludes that at the close of all evidence the evidence presented, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to find that the state had proved every element of the crime beyond a reasonable doubt.
The first assignment of error is overruled.
 III. ASSIGNMENT OF ERROR TWO
 APPELLANT'S CONVICTION FOR CHILD ENDANGERING WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.
When an appellate court reviews the weight of the evidence
 [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
 State v. Martin (1983), 20 Ohio App.3d 172, 175. Only in the exceptional case, where the evidence presented weighs heavily in favor of the defendant, will the appellate court reverse and order a new trial.State v. Otten (1986), 33 Ohio App.3d 339, 340.
The evidence that would tend to show that prior to 5 p.m. on July 13, 1999, Bethanie suffered only from minor accidental injury was not credible. For example, one detective who interviewed Megan shortly after 6 p.m. testified that Megan stated that, prior leaving for work that day, she did not notice that Bethanie had a black eye. However, the medical evidence, including the post-mortem photographs, established that Bethanie had a large, fading bruise near her eye that was at least one day old. Also, Megan described Bethanie as a very problematic child, prone to severe temper tantrums. However, the preschool teachers testified that Bethanie was a well-behaved child during her two and one-half hours spent at school each day.
Megan stated that Bethanie flailed around a lot during her tantrums,and may have injured herself in the process. However, there wasconsiderable evidence that Chelsea often became angry and lost control,yet the nurse who examined Chelsea found only two fresh bruises onChelsea, the result of someone grabbing her. Megan also said thatBethanie occasionally slipped getting out of the tub, when Smathersbathed the girls. Yet Chelsea did not appear to have this problem,despite the fact that she had a developmental age of twelve to eighteenmonths. The teachers, presumptively disinterested witnesses whotestified that they did not see evidence of abuse, had not seen Bethaniefor six weeks prior to her death.
There was evidence that prior to 5 p.m. on July 13, 1999, Megan knew of numerous injuries to Bethanie, which occurred while Bethanie was alone with Smathers. The severity of some of the older injuries and the sheer number of the bruises and abrasions were enough to put a reasonable person on notice that Bethanie was the victim of abuse. Nonetheless, Megan left Bethanie in the sole care and custody of Smathers on July 13, 1999 and while in the sole care and custody of Smathers, Bethanie died of a blunt force trauma to her abdomen.
This court cannot conclude that the jury clearly lost its way or that a manifest miscarriage of justice occurred when the jury found Megan guilty of felony child endangering. Megan's second assignment of error is overruled.
Having overruled both assignments of error, we affirm the judgment of the trial court.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Summit, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
 ___________________________ WILLIAM R. BAIRD
FOR THE COURT, BATCHELDER, P. J., WHITMORE, J., CONCUR.